McDUFFEE et al. v. HESTONVILLE, M. & F. PASS. RY. CO. et al.

(Circuit Court, E. D. Pennsylvania. June 6, 1907.)

No. 45.

SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—UNAUTHORIZED CONTRACT BY TRUSTEE.

An assignee of a patent under an assignment which expressly provided that the assignee and his successors should hold the title in trust, without power to sell or incumber the same, for the benefit of three persons named, and who had himself become the owner of one of the interests, entered into a contract by which he agreed to sell all right, title, and interest in the patent, together with all claims for damages for past infringements; the purchaser having full knowledge of the condition of the title. *Held*, that such contract was not specifically enforceable in equity without proof that it was authorized or ratified by the owners of the other beneficial interests, and that such authorization or ratification was not established by the fact that they ratified a second contract made by the trustee a few days later for a sale of the patent to another for a larger price.

In Equity.

Thomas F. Sheridan, Clifton V. Edwards, and Joseph C. Fraley, for complainants.

C. L. Buckingham and John G. Johnson, for defendants.

J. B. McPHERSON, District Judge. This action, which was begun in December, 1896, was originally a bill in equity brought by John I. McDuffee, trustee, against the Hestonville, Mantua & Fairmount Passenger Railway Company, and was based upon an alleged infringement of letters patent granted for certain improvements in electric

railways. The inventor was William Schlesinger, whose application, numbered 183,871, was filed on November 24, 1885. The patent issued thereon is numbered 546,059, and was granted on September 10, 1895, to John I. McDuffee, trustee, in whom the inventor's interest had meanwhile become vested, through a series of assignments which for the present is not of importance. The complainant's prima facie case was completed in May, 1897, and thereafter no further step in the litigation seems to have been taken until October, 1906, when McDuffee, trustee, and the Allis-Chalmers Company asked for leave to file a supplemental bill, in which it was averred that on June 16, 1906, McDuffee, trustee, and his cestuis que trustent had assigned all their interest in the patent and in the pending suit to the Allis-Chalmers Company, and praying that this company might become a party complainant and might have the same relief as McDuffee, trustee, might have had if the assignment had not been made. The General Electric Company, which had been conducting the defense, applied at the same time for leave to intervene formally as a defendant and to file a cross-bill. In November the court granted both petitions, the result being that the complainants filed the supplemental bill, and the defendants filed a cross-bill, the respective answers to which raise the question whether the assignment of June 16, 1906, to the Allis-Chalmers Company, was a valid assignment. The contention of the electric company is that by a contract made before June 16, 1906, it had itself become the equitable owner of the patent, and that the title of the Allis-Chalmers Company was acquired with notice of this earlier agreement, and is therefore inferior in effect. Suitable relief was prayed for in both bills, testimony was taken on the issue of ownership, and this question alone is now presented for decision. The original controversy awaits the determination of the pending dispute.

There is little dispute about the facts, and I shall state them as briefly as may be consistent with clearness. The application and patent in suit had been in controversy for several years before 1906—when this dispute about title arose—and other actions had been brought upon it in other jurisdictions. These actions, or most of them, were defended by the electric company, which was the real defendant, and after a while that company concluded that it would be cheaper and less troublesome to buy the patent than to go on with the litigation. Accordingly negotiations were carried on with McDuffee at intervals during a period of some length before the transaction that is about to be described. And, in order to consider one question at a time, let it be assumed for the present that McDuffee—although described as trustee—was the absolute owner of the patent, and was therefore dealing in his own right, while these negotiations were going on. Bearing this assumption in mind, what took place was this: After the preliminary negotiation between McDuffee and the electric company had been prolonged to the early part of June, 1906, McDuffee wrote and delivered the following letter in the office of Mr. Buckingham, who was one of the New York counsel of the electric company:

"C. L. Buckingham, Esq., 38 Park Row, New York, N. Y.

"Dear Sir: In the matter of the Schlesinger litigation and the suggested compromise, I would state that I will give your company, the General Elec-

tric Company, an option until June 9 to acquire all right, title and interest in all letters patent upon which suits have been brought by me or in connection with the Schlesinger interests, and also the control of said suits and all rights of action under said patents, with possible damages, past, present, and future, for the sum of twenty thousand dollars ($20,000.00). This offer and option is to be without prejudice.

"Very truly yours, John I. McDuffee, Trustee."

As Buckingham was not empowered to accept such a proposition, he sent it, on the same day, to the general counsel of the electric company, and upon the morning of June 9th received the following authority from a fully accredited representative of the company:

"New York, June 9, 1906.

"Charles L. Buckingham, Esq., 38 Park Row, New York, N. Y.

"Subject—Schlesinger Patents.

"Dear Mr. Buckingham: Referring to the question of purchasing the Schlesinger patents for the sum of $20,000, which you had up with Mr. Neave, and to my telephone conversation with you of this morning, this is to confirm the understanding that you are authorized to purchase these patents on behalf of the General Electric and Westinghouse Companies for the sum of $20,000, such purchase to include all claims for past damages, etc.

"I understand that you are to call up the parties on the telephone this afternoon to inform them of our acceptance.

"Very truly yours, Charles A. Terry."

Anticipating that the offer would be accepted, however, Buckingham had prepared on June 8th, but had not mailed, the following letter, addressed to McDuffee, whose residence was in Philadelphia:

"New York, June 8, 1906.

"Mr. John I. McDuffee, 2201 Spring Garden St., Philadelphia, Pa.

"Dear Sir: Respecting your offer of June 4, 1906, contained in the following letter, addressed to me:

"'In the matter of the Schlesinger litigation and the suggested compromise I would state that I will give your company, the General Electric Company, an option until June 9 to acquire all right, title, and interest in all letters patent upon which suits have been brought by me or in connection with the Schlesinger interests, and also the control of said suits and all rights of action under said patents, with possible damages, past, present, and future, for the sum of twenty thousand dollars ($20,000.00). This offer and option is to be without prejudice.'

"I am pleased to say that I am authorized to accept such offer under the terms and conditions therein set forth.

"Very truly yours, C. L. Buckingham."

Immediately on receipt of Mr. Terry's letter, between 10 and 11 o'clock on the morning of June 9th, Buckingham mailed the foregoing letter, dated June 8th, and shortly afterward, during the same morning, called up by telephone Mr. A. B. Stoughton, who was McDuffee's counsel in Philadelphia, and was aware of the offer that had been made on June 4th. In this conversation Buckingham informed Stoughton that a letter accepting McDuffee's proposition had been mailed to the latter at his address in Philadelphia, and informed him, also, that a copy of the letter had been mailed to his office for immediate delivery to McDuffee. As it happened, McDuffee was in Stoughton's office when this communication took place, and was himself called to the telephone. Thereupon Buckingham informed him directly that his offer had been accepted, and that a letter to that effect had just been

mailed to his address in Philadelphia. He was further asked by Buckingham whether the acceptance was all right, and replied that it was, promising to have an assignment of the patent prepared, with such releases or other papers as might be necessary to convey a complete title to the subject-matter of the contract. In confirmation of this account of the transaction, the following letter is relevant:

"New York, June 8, 1906.

"Augustus B. Stoughton, Esq., 1506 Land Title Building, Philadelphia, Pa.

"My dear Mr. Stoughton: I now have authority to accept Mr. McDuffee's recent proposition for settlement of the Schlesinger litigation and for the purchase of his patents, and herewith enclose, in your care, a letter to him to that effect. I have also written him to his address, which we have, '2201 Spring Garden Street, Philadelphia,' but thinking that possibly he might have moved or might be away, I also send a duplicate of that letter to you, which I wish you would give him tomorrow, if possible.

"Very truly yours,      C. L. Buckingham.

"Enclosure."

Buckingham's original letter to McDuffee did not reach him on June 9th, and—the next day being Sunday—was not received until the morning of June 11th; but, as will appear from the foregoing facts, the delivery of the letter on Monday was not material, for a valid acceptance of the offer had been made on Saturday by parol over the telephone. Neither is it material to inquire what the precise meaning of the phrase "until June 9" might have been declared to be, if that date had passed without further action by either party. Whether the word "until" excluded or included June 9th seems to me to have become unimportant. Upon that day the two interested parties were in communication, practically face to face. The offer was then accepted without demur or question; and, having thus become a contract, further steps were taken upon the same day in order to carry this mutually recognized agreement into effect. In other words, both parties showed by their conduct that the offer of June 4th meant that an acceptance on June 9th would be in time, and certainly neither party can now be allowed to say that this construction, thus acted upon by both, was not correct.

Stoughton immediately undertook to prepare the papers referred to in the telephonic conversation between Buckingham and McDuffee, and on June 12th wrote the following letter:

"Phila., June 12, 1906.

"C. L. Buckingham, 38 Park Row, New York, N. Y.

"Dear Sir: I expect to have the assignments ready tomorrow and will have them executed by Mr. McDuffee. Possibly I better send you a copy so that you may see whether you want any corrections or additions.

"Yours very truly,      Augustus B. Stoughton."

He wrote again on June 14th, saying:

"Dear Sir: I enclose herewith a draft of an assignment from Mr. McDuffee to your company, and if you approve the form of it we can settle up the matter at once. Any suggestions that you want to make, I would be glad to receive. I also send by registered mail the various assignments that show McDuffee's title, and with which I believe you are familiar."

In this letter a draft assignment was inclosed for Buckingham's examination, which need not be set out in full. It recited the chain

of title to McDuffee, and thereupon assigned to the electric company "all my right, title, and interest in and to the said improvements in electric railways and electric railway conduits and in and to the said letters patent therefor respectively numbered * * * and 546,059, the same to be held and enjoyed by the said, the General Electric Company, for its own use and behoof and for the use and behoof of its legal representatives, to the full end of the term for which said letters patent are or may be granted, as fully and entirely as the same would have been held and enjoyed by me had this assignment and sale not been made."

It conveyed, also, "all rights of action under said letters patent, or any of them, together with possible damages and profits, past, present, and future, for infringement," and gave to the electric company "control of each and every suit which has heretofore been brought upon said letters patent or any of them."

Stoughton's letter of June 14th did not contain the other papers to which it refers, and he explains the omission in his letter of June 15th:

"Phila., June 15, 1906.

"C. L. Buckingham, 38 Park Row, New York, N. Y.

"Dear Sir: It seems that I did not have all of the assignments in the McDuffee matter, and therefore did not mail them as I promised to do in my letter which reached you this morning.

"Yours very truly,          Augustus B. Stoughton."

And he had not received the missing papers six days later, when he was again in communication with Buckingham, the reason being now clear enough, for on June 16th McDuffee, who had been negotiating before June 9th with the Allis-Chalmers Company, as well as with the electric company, agreed to sell the patent and the pending suits to the former company for $20,000 in cash and 25 per cent. of such net profits as might be recovered from infringers; this being a larger price than he had been offered by the electric company. Having entered into this more favorable agreement with the Allis-Chalmers Company, McDuffee wrote the following letter to Buckingham:

"Philadelphia, June 21, 1906.

"C. L. Buckingham, Esq., Attorney and Counselor at Law, New York.

"Dear Sir: Referring to my recent letter in reference to the acquisition by the General Electric Company of the interests in the Schlesinger patents in suit, I have to state that there has been so much delay and uncertainty whether the matter would be consummated by your clients that I have availed myself of the opportunity to make other arrangements in regard to these patents.

"I am obliged for the interest that you have taken in the matter, but my experience in the past has been such that I could not afford to depend upon your clients taking these patents, as I had nothing definite from you, and it was necessary that I should act promptly.

"Very respectfully,          John I. McDuffee."

To this communication Buckingham replied on June 22d:

"New York, June 22, 1906.

"Mr. John I. McDuffee, 2201 Spring Garden St., Philadelphia, Pa.

"My dear Mr. McDuffee: I have just received yours which is as follows:

* * * * * * * * * *

"Clearly any such repudiation of our agreement would place me in a very ridiculous position, and I am sure that what you have written has been in-

considerately done. The closing up of the title necessarily involved a considerable labor in the proper preparation and execution of title in this particular case; but this I have at all times been ready to do, although very busy with some other matters.

"I have been awaiting further papers from Mr. Stoughton, which in his letters he had promised to send me, and it was only yesterday or the day before that he called me up, saying that he thought such further papers as we needed were to be found in the Schlesinger record; nor did he intimate that there was any such haste as would be implied from your letter.

"If you have any substantial doubt as to our good faith in the matter, I will send you my own check for a thousand dollars.

"I cannot agree that it is your privilege to repudiate our agreement, and I accordingly now say that I am ready to meet you or your representatives immediately to close it up. I merely wish to make sure that the chain of title which we are to receive is correct and complete; and this I assume may be done in any two or three hours by Mr. Stoughton and myself.

"Very truly yours, C. L. Buckingham."

On June 23d he answered further:

"New York, June 23, 1906.

"Mr. John I. McDuffee, 2201 Spring Garden Street, Philadelphia, Pa.

"Dear Sir: I am surprised that, in reply to my letter of yesterday relating to your proposed repudiation of our agreement for the sale and transfer of the Schlesinger patents and other matters relating thereto, you have not called me on the telephone. I sincerely trust that you may not persist in your purpose to repudiate our agreement. The contract between us was complete and valid, and, as I told you yesterday, we are fully prepared to close the transaction and to pay you the twenty thousand dollars (the price agreed upon), upon a transfer of title to us. We ask and demand performance on your part, and this we do with the assurance to you that the price agreed upon will be paid to you immediately upon the execution of any suitable assignment.

"Very truly yours, C. L. Buckingham."

To these letters McDuffee replied on June 26th:

"Dear Sir: Replying to your favor of the 23d inst., I have already stated in my last communication all that can be said on the subject.

"Regretting my inability to add anything further, I am,

"Very respectfully, John I. McDuffee."

This closed the correspondence, and nothing more need be said about the transaction, except to add that the Allis-Chalmers Company was aware of the proposition of June 4th, and of the electric company's acceptance, dated June 8th, before the subsequent agreement of June 16th was made, and that this agreement was carried out by the parties thereto; the $20,000 in cash being paid by the Allis-Chalmers Company, in return wherefor it received, on September 5, 1906, an assignment of the patent and of the pending suits, with such other papers as were necessary to confirm McDuffee's legal ownership of the patent and to ratify his undertaking to sell.

It will be seen, therefore, that the situation was this: An owner of property, which both A. and B., who are rivals in business, regard as a desirable purchase, gives to A. an unconditional offer to sell before a given date. Within the time limit A. accepts unconditionally and the owner declares his acceptance to be satisfactory, directing his own counsel to take the necessary steps to transfer a good title. While the formal transfer is still incomplete, B., who knows of the owner's

offer and of A.'s acceptance, and sees that his rival is about to profit by the exercise of superior diligence, makes a larger offer to the owner for the same property, and so inflames his cupidity that he breaks his contract with A. and agrees to transfer the title to B. In such a condition of things, all the parties being before the court in an appropriate proceeding, and the title to the property being still in B., I take it that a court of equity would delay action no longer than might be necessary to draft a decree, and would specifically enforce the first contract, either by requiring B. to reconvey to the owner, and the owner thereupon to convey to A., or—perhaps to avoid circuity—by compelling B. to convey directly to A., the first equitable vendee, from whom B. had knowingly and wrongfully diverted the title. As it seems to me, an elaborate vindication of such a decree would be superfluous, and I shall not take time, therefore, to refer to the authorities that support the right and the duty of a court of equity to redress so flagrant a wrong.

But it must not be forgotten that this conclusion rests upon the assumption that McDuffee was the absolute owner of the patent and had the undoubted right to sell; and it therefore becomes necessary now to inquire whether the conclusion should be modified if the fact turns out to be that McDuffee was not the absolute owner and had no right to sell the whole interest in the patent. That his title was in truth thus qualified—that he was only a trustee as to much of the beneficial interest, and had no power to convey the whole title—does not admit of question. As early as January 22, 1894, A. H. Williams, who was then the legal owner of the whole title to application No. 183,871, conveyed it, with other interests, to Schlesinger, "his assignees and successors in trust as herein provided," defining the trust as follows:

"The said William M. Schlesinger and his successors in the trust, to have and to hold the same in trust, without power to sell, incumber, or otherwise dispose of said patents and applications, renewals, extensions, or other interests therein obtained, for the following named persons, to wit: William M. Schlesinger, Susan E. McDuffee, and the said Alfred H. Williams."

On March 6, 1895, Schlesinger assigned the same interest, "so far as I have any right so to do, unto John I. McDuffee, of Philadelphia, Pennsylvania, trustee." The result of these conveyances, which were duly recorded in the Patent Office in 1894 and 1895, respectively, was to assign to McDuffee individually Schlesinger's interest in the application No. 183,871, and to make McDuffee the trustee for the equitable interests of Susan McDuffee and of Williams. On September 28, 1894, Susan McDuffee, who was the wife of John I. McDuffee, died testate, giving the residue of her estate, including her interest in this application and patent, to William S. Ferguson, as trustee—afterwards succeeded in the trust by James B. Watson—"in trust during the lifetime of my husband, John I. McDuffee, to pay over to him, from time to time, the net income, free and clear of his debts, contracts, engagements, alienations, and anticipations, and free and clear of all levies, attachments, executions, and sequestrations: it being my intention that he shall receive this income from time to time for his personal benefit, and that his creditors or assignees shall receive no benefit therefrom." This will was duly recorded in the county of

Philadelphia. How far the trustee may have had power under the will, without an order from the proper court, to assign the interest of the testatrix in this patent, is a question not now important; but this much at least is certain: McDuffee alone, without the joinder of his trustee, could not have assigned his equitable interest under his wife's bequest. Later, in January, 1901—for what reason does not appear—Schlesinger, although he had apparently parted with his individual interest by the assignment of March 6, 1895, appointed McDuffee "my true and lawful attorney, for me and in my name to sell, mortgage, transfer, and grant licenses and other privileges under, and to execute and deliver assignments, licenses, and conveyances of, the following letters patent and applications for patents" (including the application in question). This instrument was not recorded in the Patent Office until October, 1906, and it does not appear in proof whether its existence was known to the electric company or to the Allis-Chalmers Company before June 16th of that year. As it seems to me, however, the failure to record this power of attorney was not important; for Schlesinger's assignment of March, 1895, gave to McDuffee, prima facie, all the right to sell that was needed in order to convey Schlesinger's interest.

The condition of the title thus described was well known to all parties concerned, and therefore, when McDuffee's offer of June 4th was made, the electric company understood that he alone could not convey a good title, and that the consent of his trustee and also of Williams must be obtained before a valid assignment of the whole patent could be made. Undoubtedly McDuffee's offer implied that he would procure the consent of these persons; but, just as undoubtedly, the electric company took the risk that he might afterwards be unable, or might refuse, to carry out his implied contract in this respect. If it be supposed for the moment that the assignment to the Allis-Chalmers Company had never been made, but that the sale to the electric company had fallen through, merely because Williams, or McDuffee's trustee, had refused to be bound by McDuffee's offer of June 4th, the electric company would have had no legal or equitable right to compel the cestuis que trustent to carry out a bargain that they had neither authorized nor ratified; and, whatever the electric company's right against McDuffee himself might have been to recover damages for his breach of contract, it would have had no right of action of any kind against the owners for whom McDuffee was simply the trustee. The terms of his trust expressly denied him the power to sell, and, of course, he could not enlarge his competency by his own act, and thus enable himself to take away the property of others without their consent.

If, therefore, I repeat, the assignment of June 16th to the Allis-Chalmers Company had never been made, the electric company could not be granted the decree of specific performance for which the cross-bill prays. The agreement of which the court is asked to compel the performance is an agreement to convey the whole title, and undoubtedly the electric company would be content with no less. But, as McDuffee could not convey what he never had, and as the court has no power over persons who are not parties to the cross-bill—even if it

were true, as it is not proved, that they authorized or ratified McDuf-fee's agreement to sell their interests to the electric company—mani-festly a decree of specific performance would be out of the question. The court would be bound to dismiss the bill, leaving the electric com-pany to prosecute whatever right at law it might be found to possess against McDuffee individually. If this is sound—as I believe it to be—does the intervention of the Allis-Chalmers Company require the court to reach a different conclusion? To this question I feel bound to answer, "No;" for I am unable to see how the intrusion of this company has increased the right of the electric company to have the decree asked for by the cross-bill. McDuffee's right to convey was certainly not enlarged by the sharp practice of the Allis-Chalmers Company, nor did such practice diminish in the least the property rights of Williams or of McDuffee's trustee. The difficulties in the way of a decree of specific performance are just as insuperable now as they would have been if the agreement of June 16th with the Allis-Chalmers Company had never been made. The cestuis que trustent had a right to sell to whomsoever they pleased. Their trustee could not bind them by his individual unauthorized agreement to sell, for his inability to sell was written into his record title, and, moreover, was actually known to all the parties concerned. With record notice, therefore, and with actual notice, also, that McDuffee could not sell the interests of the other equitable owners, it must be held, I think, that both the electric company and the Allis-Chalmers Company dealt with him at their peril, so far as these other interests were concerned. It is these interests that are the decisive factor. They had it in their power to select either company as vendee. Having this power, they chose the Allis-Chalmers Company, and with that choice I have no power to interfere.

It remains briefly to consider the argument that the record contains evidence from which it may properly be inferred that McDuffee, trus-tee, did have authority from his cestuis que trustent to sell their in-terests on June 4th, when he made the offer to the General Electric Company, and therefore that they are bound by his action. I do not think it necessary to discuss this evidence at length. It consists in part of McDuffee's own declarations that he was authorized to sell, and of his acts in agreeing so to do, and, upon familiar principles, his agency cannot in this way be established. There is one written in-strument, however, that was signed by the cestuis que trustent them-selves, and it is upon this paper that reliance is chiefly placed to show the existence of McDuffee's agency on June 4th. The writing is dated September 5, 1906, and after reciting the title to McDuffee, trustee, and setting out, also, the fact that the trustee had no power to sell, it then refers to the agreement of June 16th with the Allis-Chalmers Company, and goes on, in the name of the several cestuis que trustent, to "severally and collectively ratify and confirm the aforesaid assignments from William M. Schlesinger to John I. Mc-Duffee, trustee, and from John I. McDuffee, trustee, to the Allis-Chalmers Company, and [we] do hereby release, sell, assign, transfer, and convey to the aforesaid Allis-Chalmers Company, for its own use

154 F.—14

and behoof, all my [our] right, title, and interest in and to the aforesaid letters patent, and each of them, and all rights thereunder, including all rights of action, at law or in equity, for past infringement thereof." The bearing of this paper upon the question now under consideration is said to be that, in the agreement of June 16th—which is signed by McDuffee alone and the Allis-Chalmers Company—he declares that he is "the sole owner as trustee, and has the right and power to transfer certain letters patent of the United States, which are in litigation, as follows: * * * Schlesinger, No. 546,059." It is therefore argued that, when the cestuis que trustent on September 5th ratified the agreement of June 16th, they intended to indorse McDuffee's statement that he was the sole owner and had the right and power to convey. But, even if this was the intention of the parties, it does not follow that his statement means to affirm that he had the right to convey on June 4th or June 9th, whatever power he may have had a week later; and, in the absence of definite evidence on this subject, I cannot find that the General Electric Company has removed the presumption of inability to convey that inhered in McDuffee's title as trustee. Such inability was written into the title when the trust was created, and it has not been shown to have been altered in any way. The burden of proving that this limitation on the power of the trustee had been either modified or extinguished was upon the General Electric Company, and in my opinion the necessary proof has not been offered. Moreover, I think it a more reasonable construction of the instrument dated June 16th to hold, that it only declares McDuffee's right to convey whatever he owned "as trustee," and that the agreement of September 5th had in view the transfer that was thus attempted, and intended to supply whatever power McDuffee may have then lacked to pass a good and complete title. The agreement of June 16th contemplates that "other formal documents and deeds and writings * * * may be necessary for more effectively assuring and assigning the above interests," and the instrument of September was intended to supply all possible defects in McDuffee's attempted transfer. This instrument ratifies and confirms, not only his agreement of June 16th, but also the assignment from Schlesinger to McDuffee, trustee, in March, 1895, although this contains an express limitation on the trustee's right to convey; and, not content even with this, the cestuis que trustent then proceed to convey directly their own right, title, and interest—the intention of the whole agreement evidently being to set at rest absolutely the question in whom the power rested to make a formal instrument of complete conveyance to the Allis-Chalmers Company. It seems to me impossible so to construe the instrument of September 5th as the General Electric Company now contends.

This leaves nothing to be disposed of, except to order the payment of the costs that have accrued upon the supplemental bill, the cross-bill, and the proceedings that have followed thereon. Upon this subject I shall only say that, considering the equities that have been disclosed by the evidence and referred to in this opinion, I think the discretion of the court will be properly exercised by directing that the

costs referred to shall be paid equally by John I. McDuffee, the General Electric Company, and the Allis-Chalmers Company.

An appropriate decree in accordance with this opinion may be prepared by counsel.